UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    *Plaintiff*,

    *vs.*                         Case No. 25-mj-148-amb

CHRISTIAN ERAZO VALDEZ,

    *Defendant*.

---

### REPLY IN SUPPORT OF MOTION TO DISMISS

Every valid law Congress enacts must draw its authority from the Constitution, and in this case the government relies solely on the immigration power to justify § 611. That power is undoubtedly broad, allowing Congress to regulate who enters the country and what rules they must follow to remain here. As necessary and proper to accomplish those ends, Congress may also pass *criminal* laws, proscribing conduct that thwarts the immigration process. So, for example, when an alien lies on immigration paperwork, refuses to register with immigration authorities, or enters the country without authorization, Congress can criminalize that conduct.

But § 611 doesn't regulate the process or conditions for entering or remaining in the country. It's about who gets to vote. And the Constitution's text, the historical record, and the Supreme Court's precedent show that only the States can regulate the composition of the federal electorate. So the government advances a novel argument to justify § 611's voter qualification: it argues that the immigration power authorizes

Congress to criminalize the conduct of aliens, *even in matters unrelated to the immigration process*. The government is wrong twice over.

First, the government is wrong that it has a general police power over aliens. It has effectively asserted the authority to create a general criminal code over the 52 million noncitizens in this country. This shocking claim is unsupported by precedent, and the government has failed to identify a single other criminal law targeting noncitizens without any nexus to the regulation of immigration. It has likewise failed to identify any limiting principle to this power. If its authority to criminalize alien conduct lets it ban noncitizen voting, then it can also ban noncitizen drinking and driving, fighting, loitering, or any example of purely local conduct. But it cannot criminalize those acts simply because an alien committed them; the Framers denied Congress the police power.

Second, the government is wrong that it can decide who gets to vote. Even if it possesses the extraordinary police power it lays claim to, the Voter Qualification Clauses trump Congress's plenary powers (like immigration). The Constitution contains affirmative restraints carving out "elements of state sovereignty that Congress may not employ its delegated powers to displace." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985). The Voter Qualification Clauses are precisely such a restraint: Congress has no authority to establish voter qualifications, and it may not employ even its plenary immigration power to displace the State's exclusive sovereignty over the federal electorate's composition.

In short, § 611 exceeds Congress's enumerated powers and violates a crucial affirmative restraint. The facially unconstitutional information must be dismissed.

I.    **Plenary power over immigration isn't a police power over immigrants.**

Although Congress has plenary power over immigration, the Supreme Court has never held that it has a police power over aliens. As Justice Stone recognized almost a century ago, Congress lacks a general police power over aliens, and the cases the government relies on do not hold that Congress has a blank check to criminalize alien conduct in matters unrelated to immigration. Because the Framers denied Congress a general police power over local conduct, the government's asserted authority amounts to an unprecedented power grab with no historical or legal precedent.

A.    **Section 611 isn't about the admission of aliens or the conditions of their right to remain; it's a voter qualification law unrelated to the immigration process.**

The "power to admit or exclude aliens is a sovereign prerogative." *Dep't of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (citation omitted). Article I grants Congress the authority to establish a "uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. From this power, the Legislature derives the "plenary authority to decide which aliens to admit," and the corollary power "to set the procedures to be followed in determining whether an alien should be admitted." *Thuraissigiam*, 591 U.S. at 139. As a result, the "admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Put simply, the government has "undoubted power" over "immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012).

3

Those principles are reflected in the government's response. It notes Congress's "complete" legislative power over "the admission of aliens"; it highlights the Legislature's "plenary power" over naturalization; and it stresses Congress's authority to craft policies "pertaining to entry of aliens and their right to remain." Gov. Br. at 3 (citations omitted). But § 611 doesn't regulate the entry, admission, or naturalization of aliens. It doesn't say who gets to enter or remain in the country and on what terms. Rather, it dictates who gets to vote, and in doing so it prescribes "the composition of the federal electorate." *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 16 (2013). Section 611 isn't an immigration law; it's a voter qualification law.

The companion statutes to § 611 show what an immigration law related to voting looks like. In 1996, when Congress criminalized noncitizen voting in Title 18, it added other provisions to Title 8 tying noncitizen voting to entry and removal. Specifically, the Act provided that an alien who votes in violation of "any" federal, state, or local law is "inadmissible." 8 U.S.C. § 1182(a)(10)(D)(i). The Act likewise provided that an alien who unlawfully votes in "any" election is deportable. *Id.* § 1227(a)(6)(A). *That's* what an exercise of the immigration power in this context looks like—prohibiting entry or mandating removal following a violation of any election law (including state law). Those provisions of Title 8 pertain to the "admission of aliens" and the exclusion of "those who possess those characteristics which Congress has forbidden." *Boutilier v. Immigr. & Naturalization Serv.*, 387 U.S. 118, 123 (1967). As such, they are plainly an exercise of Congress's plenary power over the entry of aliens and their right to remain.

Section 611, conversely, doesn't regulate the conditions under which an alien can enter or remain in the country. It dictates who gets to vote and excludes noncitizens from the franchise on pain of imprisonment. The government insists that the statute "is not a qualification to vote," and this is simply wrong. Gov. Br. at 1. A law prescribing "*who* may vote" in federal elections is the very definition of a voter qualification. *Inter Tribal Council*, 570 U.S. at 16. As the following will show, the immigration power doesn't grant Congress the unilateral power to set a qualification criminalizing noncitizen voting; the cases the government relies on merely permit Congress to make statutory classifications based on alienage, but do not grant Congress a general police power over aliens.

**B.    Congress's power to make alienage-based classifications doesn't give it nationwide police power over every noncitizen within the country.**

Conceding that § 611 doesn't regulate alien admission or removal, the government claims that it's nevertheless within the immigration power because Congress has "the authority to proscribe conduct of noncitizens living in the United States (like voting) and punish non-compliance with criminal penalties." Gov. Br. at 3 (citing *City of Chicago v. Shalala*, 189 F.3d 598, 604-05 (7th Cir. 1999)).[1] That assertion (relying on an equal protection case) erroneously conflates the relaxed standard of review for classifications based on alienage with a police power over aliens. But Congress doesn't have a police power over aliens within the country. The Framers left the police power in the States' hands, and Congress's plenary power to regulate the immigration process doesn't let it

___

[1] *Shalala* wasn't a voting case, and the words "voting" or "conduct" appear nowhere in the opinion. The government's self-serving gloss of the case doesn't reflect its actual holding.

criminalize alien conduct unrelated to immigration. This Court should reject the notion that Congress can pass any criminal law under the sun so long as it's targeted only at noncitizens. Neither the Constitution nor precedent supports that power grab.

### i. *Shalala* doesn't hold that Congress has plenary power over an alien's conduct.

To fully appreciate the wrongness of the government's argument, it's necessary to begin with the case *Shalala* relied on and applied: the decision in *Mathews v. Diaz*, 426 U.S. 67 (1976). *Diaz* concerned a federal law limiting an alien's Medicare eligibility to only those who had resided in the country for five years and applied for permanent residence. *Id.* at 69. The issue the Court had to untangle was whether barring certain aliens from the program passed constitutional muster under the Fifth Amendment. *Id.* at 80 (explaining that the question presented was whether "statutory discrimination" within "the class of aliens allowing benefits to some aliens but not to others is permissible"). *Diaz* wasn't about criminalizing alien conduct; it was about due process and equal protection.

The Supreme Court held that the challenged classification was constitutional. The "fact that Congress has provided some welfare benefits for citizens," the Court explained, "does not require it to provide like benefits for [a]ll aliens." *Id.* at 80. It then reasoned that "the responsibility for regulating the relationship between the United States and our alien visitors" belongs to Congress. *Id.* at 81. The Court concluded that because the "wide variety of classifications" between different types of aliens "must be defined in the light of changing political and economic circumstances," the alienage classification at issue should be subject to only a "narrow standard of review." *Id.* at 82. And because the line

Congress drew (five years of residency) wasn't "wholly irrational," the classification didn't violate the Fifth Amendment. *Id.* at 83.

*Shalala*, the case the government says permits the criminalization of any alien conduct, is a straightforward application of *Diaz*. There, the plaintiffs challenged a federal statute restricting "certain noncitizens' eligibility for welfare benefits." 189 F.3d at 600. The *Shalala* Court concluded that *Diaz* was "directly on point on the issue of what level of scrutiny should be applied to Congressional regulation of aliens' welfare benefits." *Id.* at 604. Because *Diaz* "applied rational basis review," *id.*, and because the denial of welfare benefits to all aliens survived that standard of review, the *Shalala* Court concluded that the challenged denial of benefits didn't violate equal protection, *id.* at 609.

As the above has shown, *Diaz* and *Shalala* didn't involve criminal statutes; didn't analyze the extent of Congress's immigration power to enact criminal laws; and (most importantly) didn't hold that Congress has carte blanche to criminalize the conduct of aliens within the country. Rather, *Diaz* held that treating dissimilar classes of aliens differently for purposes of allocating federal benefits doesn't violate due process, and *Shalala* held that denying welfare benefits to certain aliens didn't violate equal protection. These cases are about the standard of review when a federal statute draws lines based on alienage; neither case provides the sweeping rule the government attempts to extrapolate from them. And they plainly do not hold that Congress can criminalize every aspect of an alien's conduct within the country in matters unrelated to immigration.

7

### ii. Congress lacks a general police power over the conduct of aliens.

It has been "clear" for over two centuries that "Congress cannot punish felonies generally." *Cohens v. Virginia*, 6 Wheat. 264, 428, 5 L.Ed. 257 (1821). That's because the Constitution withholds from Congress a "plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. 549, 566 (1995); *United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000). The States, not Congress, are the designated repository of the police power. *Bond v. United States*, 572 U.S. 844, 854 (2014) (citing *Lopez*, 514 U.S. at 567). And there's "no better example of the police power" than the suppression of crime; the States possess the "primary authority for defining and enforcing the criminal law." *Morrison*, 529 U.S. at 618 (first quote); *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1992) (second quote). In Justice Kennedy's words, were the government "to take over the regulation of entire areas of traditional state concern," then "the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." *Lopez*, 514 U.S. at 577 (Kennedy, J., concurring).

The *Diaz* Court noted that "Congress regularly makes rules [for aliens] that would be unacceptable if applied to citizens," singling out the "exclusion" of aliens and "the power to deport them." 426 U.S. at 80. The Court has described this as a "fundamental premise of immigration law." *Demore v. Kim*, 538 U.S. 510, 521 (2003) (upholding immigration law mandating some aliens' detention pending removal).[2] It's from this

---

[2] By way of comparison, a law *mandating* pretrial detention in a criminal case would almost certainly be unconstitutional. *See United States v. Salerno*, 481 U.S. 739 (1987) (approving Bail Reform Act's individualized procedural safeguards).

8

statement that the government asserts a "plenary power" to criminalize noncitizen voting, "regardless of whether a federal voting restriction could constitutionally be applied to citizens." Gov. Br. at 5. But in the words of Justice Stone, the "federal government has no general police power over aliens" and, after entry, to the extent it can "exercise any control over them, it must be in the pursuance of a power granted to it by the Constitution." *Hines v. Davidowitz*, 312 U.S. 52, 76 (1941) (Stone, J., dissenting).[3]

That Congress lacks a police power over aliens flows from the core principle animating this brief: Congress's immigration power is "subject to important constitutional limitations" and must be implemented by "constitutionally permissible means." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (quotation omitted). The government's declaration of the authority to proscribe the conduct of noncitizens amounts to an assertion of the police power—a sweeping power the Framers intentionally denied Congress. *See Cohens*, 6 Wheat. at 428; *Lopez*, 514 U.S. at 566; *Morrison*, 529 U.S. at 618.

The government's claimed power to criminalize the conduct of aliens has no stopping point. Nothing in the government's reasoning is limited to voting. By its logic, Congress could pass a law targeting OWI on non-federal roads if the driver is a noncitizen. It could prosecute run-of-the-mill assaults and batteries committed by lawful permanent residents. And it could even go after undocumented immigrants for

---

[3] Although Justice Stone dissented in *Hines*, the issue in that case was whether a state statute mandating the registration of aliens was preempted. Justice Stone disagreed with the majority that it was preempted, and the *Hines* majority didn't dispute his contention that the federal government lacked a general police power over aliens, and it didn't hold that the government *did* have this power. And it goes without saying that the registration of aliens within our borders is a part of the immigration power. *See, e.g., Arizona*, 567 U.S. at 400–01.

jaywalking. The government asserts that § 611 is justified by Congress's enumerated authority based only on its immigration power, and if this Court agrees, Congress could equally criminalize any other act committed by a noncitizen—including any of the above examples. But Congress unequivocally cannot reach "purely local crimes," *Bond*, 572 U.S. at 860, and so the government's assertion of a general police power over aliens flies in the face of longstanding and crucial "constitutional limitations," *Zadvydas*, 533 U.S. at 678. Congress has no general police power over aliens.

### iii. The government's comparator laws do not show a police power over aliens.

We have a clear tell that the immigration power doesn't let Congress criminalize an alien's conduct in matters unrelated to the immigration process: the government's failure to point to any law along those lines. If the government had this authority, one would expect there to be a Supreme Court case acknowledging this awesome power. And one would expect there to be a bevy of laws criminalizing the conduct of aliens unrelated to admission, removal, and other immigration matters. Instead, the government cites two comparator laws, neither of which supports its claimed police power over aliens.

First, the government invokes 18 U.S.C. § 1015(e), which criminalizes making a false statement of citizenship in voting or registering to vote. Gov. Br. at 3. But this law is nothing like § 611; indeed, it's justified by two of Congress's enumerated powers. It's within the immigration power because the government can require aliens to register with immigration authorities and make truthful representations about their status. *Arizona*, 567 U.S. at 395–96. And it's within the Elections Clause because Congress can enact laws targeting voter fraud. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Because § 1015(e) targets

fraudulent statements and thus addresses the *how* of voting, rather than dictating *who* can vote, it's plainly justified by the Elections Clause. *Inter Tribal Council*, 570 U.S. at 16.

The only other law the government invokes ironically underscores that the immigration power isn't a plenary power over aliens. It cites to a firearm law prohibiting an illegally-present alien from possessing a firearm—*provided that* the firearm "affect[ed] commerce." 18 U.S.C. § 922(g)(5). That jurisdictional element authorizes the statute under the Commerce Clause, and its inclusion belies the government's assertion of a general police power over aliens. If Congress could criminalize any aspect of the conduct of aliens, there would be no need to invoke the Commerce Clause. That jurisdictional hook is of course necessary for other laws like § 922(g)(1), but why would Congress add a superfluous element to § 922(g)(5), unnecessarily enhancing its burden of proof and narrowing the scope of aliens that it could target? The answer is because the Commerce Clause jurisdictional hook is essential to the statute's constitutionality. S*ee Lopez*, 514 U.S. at 567. That jurisdictional element wouldn't be necessary if Congress could criminalize any aspect of alien conduct under the immigration power—but it can't.

In sum, the government has pointed to *no* federal criminal law (except § 611) based solely on the accused's alienage without a nexus to the immigration process. To paraphrase *Lopez*, notwithstanding the "great deference to congressional action," courts cannot "convert congressional authority under the [immigration power] to a general police power of the sort retained by the States." *See* 514 U.S. at 567. That would trample "important constitutional limitations" on Congress's power, *Zadvydas*, 533 U.S. at 678, by handing it the police power the Framers wisely withheld, *Lopez*, 514 U.S. at 566.

11

* * * *

"There are literally millions of aliens within the jurisdiction of the United States." *Diaz*, 426 U.S. at 77. Their status ranges from lawful permanent residents to the unauthorized but they are all noncitizens. The government claims it can pass any criminal law it pleases so long as an alien is in the crosshairs, and it provides no limiting principle. If the Court agrees that Congress's power over them is plenary, there's no criminal law targeting aliens that's off the table. We are a nation of immigrants and a government of limited powers. The Court should reject the government's theory of a general police power over aliens, a dangerous assertion the Constitution thankfully forecloses.

12

**II.     The Constitution's affirmative restraint on Congress's power to set voter qualifications trumps its plenary power over immigration.**

There's a second reason why Congress doesn't have the power to ban noncitizen voting: where the Constitution imposes an affirmative restraint on federal power to preserve State sovereignty, that affirmative restraint trumps Congressional action—even in areas where the government has plenary authority. And because the Voter Qualification Clauses are precisely such an affirmative restraint, they preclude Congress from establishing any voter qualification. In other words, even if the government does possess the general police power over aliens it asserts, it *still* loses.

This section begins by surveying the entrenched principle that the Constitution's affirmative restraints categorically bar Congressional action, even in areas where it otherwise has plenary power. It then shows why the Voter Qualification Clauses are such an affirmative restraint and forbid § 611's operation: the Constitution's text and structure, the relevant historical evidence, and the Supreme Court's guidance leave no doubt that the Framers reserved the power to set voter qualifications exclusively to the States.

**A.     The Constitution's affirmative restraints trump enumerated federal power.**

There are a few affirmative checks on federal power embedded in the Constitution that restrain federal authority and modify the scope of Congress's enumerated powers. Most of them pertain to individual rights and are found in the Bill of Rights and the Reconstruction Amendments. The quintessential example is the First Amendment's prohibition on the abridgment of free speech. U.S. Const. amend. I. To illustrate, without

13

that venerable affirmative restraint, Congress could theoretically use its Commerce Clause power to suppress speech critical of businesses with an interstate scope.

Beyond the affirmative restraints that protect individual rights, the Constitution also contains affirmative restraints that protect State sovereignty. The Framers created "carve out[s]" expressing "elements of state sovereignty that Congress may not employ its delegated powers to displace." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985). *Garcia* provided as an example the guarantee of state territorial integrity: no new State shall be formed within the jurisdiction of an existing State, and no new State may be formed by combining States without their consent. U.S. Const. art. IV, § 3. Even if one of Congress's enumerated powers could justify unilaterally fusing two States together, Article IV's affirmative restraint prohibits it from "employ[ing] its delegated powers to displace" state territorial integrity. *Garcia*, 469 U.S. at 550.

In *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Supreme Court reaffirmed that the Constitution's affirmative restraints trump Congress's delegated powers. That case involved a challenge to the Indian Gaming Regulatory Act, enacted by Congress pursuant to the Indian Commerce Clause. *Id.* at 47; U.S. Const. art. I, § 8, cl. 3. The law allowed tribes to conduct gaming activities pursuant to a pact between the tribe and a State, and it authorized the tribe to "bring suit in federal court against a State in order to compel performance" of the State's duty to negotiate in good faith toward the pact's formation. *Seminole Tribe*, 517 U.S. at 47. But the Eleventh Amendment expressly bars federal courts from hearing suits against the States. U.S. Const. amend. XI. The Act thus evinced a clear Congressional intent "to abrogate the States' sovereign immunity,"

14

and so the question in *Seminole Tribe* was which constitutional provision carried the day: Congress's plenary authority over Indian commerce, or the Eleventh Amendment's affirmative restraint on federal suits against the States? 517 U.S. at 47.

The affirmative restraint prevailed: the Court held that sovereign immunity barred the Act's authorization of federal suits against the States. *Id.* at 76. Critically, Congress's plenary authority over Indian affairs didn't change the equation. Although there was no dispute that "the regulation of Indian commerce" was "under the exclusive control" of the government, *id.*, that didn't overcome the Eleventh Amendment's affirmative bar. "Even when the Constitution vests in Congress complete law-making authority over a particular area," the Court explained, "the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Id.*

In short, *Garcia* and *Seminole Tribe* show that when the Constitution protects State sovereignty by affirmatively restraining Congress from legislating in a certain area, the restraint holds even if Congress invokes its delegated powers in spheres where it has complete control. Critically, there are other examples of affirmative constitutional restraints that shield State sovereignty. The Constitution provides that no State shall be deprived of equal suffrage in the Senate without its consent. U.S. Const. art. V. It mandates that amendments require three-fourths of the States to consent. *Id.* And it guarantees that the Electors to the Electoral College shall be appointed by the States.[4] U.S.

---

[4] Even that isn't an exhaustive list of the affirmative restraints that protect State sovereignty. A few more provisions protecting the "residuary and inviolable sovereignty" of the States are discussed by Justice Scalia's majority opinion in *Printz v. United States*, 521 U.S. 898, 919 (1997).

Const. art. II, § 1. That some of the affirmative restraints pertain to voting is unsurprising: the Framers knew well that placing key matters related to the franchise in the hands of the States was essential to maintaining their sovereignty and checking federal power.

As the following will show, the Voter Qualification Clauses are precisely such an affirmative restraint on federal power. Even where a voter qualification purportedly touches an area where Congress has plenary authority, like the immigration power, this affirmative restraint bars Congress from dictating the qualification to the States.

**B.      The Voter Qualification Clauses affirmatively restrain the government, precluding a federal voter qualification based on the immigration power.**

The Voter Qualification Clauses affirmatively restrain Congress from setting its own voter qualifications—the question of *who* can vote. They exclusively reserve the power to establish voter qualifications to the States and deny that power to the government. As affirmative restraints, just like the Eleventh Amendment, they prevail in this constitutional tug-of-war and preclude Congress from setting voter qualifications, even those pertaining to matters where Congress otherwise has complete control.

### i. The text and structure of the Constitution confirm the restraint.

The Constitution's text shows that establishing voter qualifications is a power reserved exclusively to the States. The original Voter Qualification Clause provides that the "Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. By its plain terms, the State sets the qualification; Congress has no role whatsoever in the matter.

Had the Framers intended for Congress to play a role in voter qualifications, they would have simply said so—as they did when delegating other electoral powers. For example, in creating the Elections Clause to grant States the power to regulate election procedures, the Framers built in federal preemption: Congress could "make or alter" those regulations. U.S. Const. art. I, § 4, cl. 1. The Voter Qualification Clause, conversely, omits any mention of federal authority. Given that the Framers chose to explicitly state that the Elections Clause was *not* an exclusive grant of power to the States, the lack of similar language in the Voter Qualification Clauses shows that those clauses *do* grant the States an exclusive power. The Supreme Court made this structural point clear in *Inter Tribal Council*: "One cannot read the Elections Clause as treating implicitly what these other constitutional provisions regulate explicitly." 570 U.S. at 16.

In the face of this clear-cut textual evidence, the government notes that the Suffrage Amendments bar "discriminatory state *and federal* voter qualifications," suggesting that perhaps Congress does have the power to set voter qualifications. Gov. Br. at 6 n.4. But the Suffrage Amendments never use the phrase "voter qualifications"; rather, they all prohibit federal legislation that "denie[s] or abridge[s]" the right to vote on their stated basis. And it's not hard to imagine how Congress could constructively deny or abridge the right to vote without formally imposing a voter qualification.

Consider the following example. The Elections Clause lets Congress regulate the time, place, and manner of elections. Imagine if Congress restricted when or how people could vote in such a way that it became hard or impossible for eighteen-year-olds to vote. An equal protection challenge to the law might be difficult. *See Mass. Bd. of Retirement v.*

17

*Murgia*, 427 U.S. 307 (1976) (age-based classifications are subject to rational review). But under the Twenty-Sixth Amendment, such a regulation constructively "abridg[ing]" the right to vote would be unconstitutional, irrespective of Congress's procedural powers. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (explaining that the Elections Clause cannot be used to "evade important constitutional restraints"). The government is wrong that the Suffrage Amendments' application to Congress only makes sense if the federal government has the power to create voter qualifications.

In sum, the Constitution's text "prescribes a straightforward rule for the composition of the federal electorate." *Inter Tribal Council*, 570 U.S. at 16. That rule allows Congress to enact *only* procedural regulations. *Id.* The plain text of the Voter Qualification Clause, read alongside the Elections Clause, demonstrates that Congress lacks the authority to decide the composition of the federal electorate.

### ii.   The relevant historical materials confirm the restraint.

The government cites to § 611's legislative history, Gov. Br. at 4, but the law is unambiguous and so its legislative history is irrelevant. The issue here is whether the Constitution authorizes the statute, and we do not look to a single legislator's floor statements to answer that question. Rather, we look to the Founding-era commentary and Convention debates leading to the original Voter Qualification Clause. *See U.S. Term Limits*, 514 U.S. at 806 (analyzing the "relevant historical materials," including the Convention debates, to interpret the Constitution). That historical evidence buttresses the conclusion established above by the Constitution's text and structure: the Framers gave Congress no role in setting voter qualifications.

18

The Framers' original intent for Article I's Voter Qualification Clause is best gleaned from the debate over Gouverneur Morris's proposed amendment to the draft of the original clause. During the Constitutional Convention, he proposed deleting the language requiring that federal voter qualifications be linked to state voter qualifications and replacing it with language allowing Congress to create its own qualifications. 2 *The Records of the Federal Convention of 1787*, 201 (Farrand 1911).[5] His motive was clear: he feared making federal voter qualifications "depend on the will of the states." *Id.*

In the face of this attempt to wrest voter qualifications into Congress's hands, Oliver Ellsworth retorted that "[t]he states are the best Judges of the circumstances and temper of their own people." *Id.* That sentiment was echoed by James Madison, Benjamin Franklin, and Pierce Butler, who maintained that the Constitution should give only the *States* the power to disenfranchise. *Id.* at 202–05. In Madison's words, "the right of suffrage is certainly one of the fundamental articles of republican Government and ought not to be left to be regulated by the [federal] Legislature." *Id.* at 203. The anti-federalist position carried the day, and Morris's proposal was resoundingly defeated. *Id.* at 206.

Beyond the Convention, other historical evidence confirms that the Framers crafted the original Voter Qualification Clause to restrain federal power. Alexander Hamilton wrote that voter qualifications in federal elections are "defined and fixed in the Constitution," and "*unalterable* by the [federal] legislature." The Federalist No. 60 (A. Hamilton) (emphasis added). Likewise, James Madison wrote that the original Voter

---

[5] The *Records* are available through the Library of Congress at https://tinyurl.com/3xxh2vbn.

19

Qualification Clause defines "the right of suffrage," and he stressed that leaving voter qualifications "open for the occasional regulation of the Congress" would have been "improper." The Federalist No. 52 (J. Madison). Puzzlingly, the government cites Federalist 52 to argue that the Voter Qualification Clause is a "limitation" on State power, Gov. Br. at 7, and that claim cannot withstand scrutiny; the Supreme Court has specifically cited Madison's essay as further proof that setting voting qualifications is "no part" of Congress's delegated power. *Inter Tribal Council*, 570 U.S. at 17.

Put simply, those unequivocal oral and written expressions from multiple Founding Fathers as to Congress's powerlessness in this arena confirm the point: the Voter Qualification Clauses carve out an element "of state sovereignty that Congress may not employ its delegated powers to displace." *See Garcia*, 469 U.S. at 550.

### iii.   The decision in *Inter Tribal Council* confirms the restraint.

In deciding whether the Constitution affirmatively restrains Congress's power to set voter qualifications, this Court is not painting on a blank canvas. In *Inter Tribal Council*, the Court analyzed the Voter Qualification Clauses and the Elections Clause and wrote clearly: "[p]rescribing voting qualifications . . . 'forms no part of the power to be conferred upon the national government,'" whose powers are "expressly restricted" by the Elections Clause "to the regulation of the *times,* the *places,* and the *manner* of elections." 570 U.S. at 17 (quoting The Federalist No. 60 (A. Hamilton)).

In doing so, the Supreme Court relied on the same text and history the defense relies on here. As a matter of text, *Inter Tribal Council* stressed that "[o]ne cannot read the Elections Clause as treating implicitly" what the Voter Qualification Clauses "regulate

explicitly." *Id.* at 16. And as a matter of history, the Court pointed to the unequivocal assertions during the Convention and in the Federalist Papers that Congress is not empowered to regulate *who* may vote in elections. *Id.* at 17. Tellingly, the government does not engage with, let alone distinguish, *Inter Tribal Council*.

Importantly, the circumstances of *Inter Tribal Council* refute the government's assertion that its plenary power over immigration authorizes § 611. That case arose in the immigration context: an Arizona law provided that only citizens could vote, and the State tried to enforce the qualification with a law designed to reject any voter registration application lacking evidence of citizenship. *Id.* at 6. In doing so, Arizona imposed a greater burden than the one required by the National Voter Registration Act. *Id.* at 7.

The Supreme Court held that the Arizona law was preempted by the NVRA. *Id.* at 20. In doing so, its analysis considered whether the Act unconstitutionally burdened Arizona's right under the Voter Qualification Clauses to impose its own qualifications. *Id.* at 15–16. The Court labeled Arizona's proof-of-citizenship requirement as a tool designed to enforce the State's citizenship voter qualification law, *id.* at 17 n.9, and it explained that a State's authority to impose voter qualifications must also allow it to craft laws enforcing those qualifications, *id.* ("the power to establish voting requirements is of little value without the power to enforce those requirements"). If a federal law "precluded" the State from enforcing its citizenship voter qualifications, the Court explained, then that would "raise serious constitutional doubts." *Id.* In other words,

21

assuming a State voter qualification doesn't invidiously discriminate,[6] Congress cannot unilaterally abrogate the voter qualification (or make it impossible to enforce). *See id.*

The constitutional principle recognized by *Inter Tribal Council* underscores that the States possess exclusive authority to make voter qualifications. The Voter Qualification Clauses prevent Congress from overriding a State's voter qualifications, and so they necessarily prevent Congress from directly imposing its own qualifications. That's because where Congress sets a qualification, it necessarily defines the electorate and instructs States on who can or cannot vote. The constitutional harm this inflicts is identical to the harm of destroying a State voter qualification: the State is deprived of its sovereign "authority to establish qualifications" for voting. *Id.* at 16.

\* \* \* \*

At bottom, the government argues that the Voter Qualification Clauses do not "restrict Congress from passing such a ban if authorized under another enumerated power." Gov. Br. at 6. That is wrong. The immigration power is "subject to important constitutional limitations," *Zadvydas*, 533 U.S. at 678 (quotation omitted), and a powerful one applies here: an affirmative restraint to protect State sovereignty. The Voter Qualification Clauses "carve out" an element "of state sovereignty that Congress may not employ its delegated powers to displace." *See Garcia*, 469 U.S. at 550. The carve out is proven by the Constitution's text, the historical evidence, and the Court's guidance:

---

[6] As discussed in the defense's underlying motion to dismiss, the Suffrage Amendments operate to bar State voter qualifications that impose discriminatory restrictions on the franchise.

"[p]rescribing voting qualifications" forms "no part of the power to be conferred upon the national government." *Inter Tribal Council*, 570 U.S. at 17 (quotation omitted).

Congress's authority over immigration—the sole power invoked to justify § 611— is of no moment. "Even when the Constitution vests in Congress complete law-making authority over a particular area," an affirmative restraint designed to protect the State's "residuary and inviolable sovereignty" prevails. *Seminole Tribe*, 517 U.S. at 72 (first quote); *Printz*, 521 U.S. at 919 (quoting The Federalist No. 39 (J. Madison)) (second quote). Because only the States can decide who gets to vote, § 611 is facially unconstitutional.

## III.   Wisconsin's noncitizen voting ban does not justify the federal ban.

As a final matter, the government argues (without citation to any authority) that the Voter Qualification Clauses merely "prohibit Congress from passing voting restrictions that *exceed* a state's restrictions." Gov. Br. at 8. And because Wisconsin doesn't allow noncitizens to vote, the government posits, § 611 doesn't conflict with state law. *Id.* This argument, utterly bereft of any legal support, fails to salvage the statute.

At risk of stating the obvious: where it has the power to act, federal law is supreme over State law. The constitutionality of a federal law cannot be made contingent on a single State's permission. Yet for over a century after the founding, noncitizen voting was commonplace in many (if not most) States.[7] By the government's logic, § 611 would have been an unconstitutional voter qualification if enacted back then. Likewise, any of the fifty States could tomorrow legalize noncitizen voting—a practice still permitted today

---

[7] The rich history of noncitizen voting in this country was discussed in the defense's underlying motion to dismiss. *See* R.20 at 5.

23

in some local elections. Once again, by the government's logic, that would apparently spell the end of § 611. That's not how the Constitution works; a State legislature cannot pass a law that renders a federal law unconstitutional. Where Congress is allowed to legislate, its enactments trump contrary State law. U.S. Const. art. VI, cl. 2. But Congress isn't allowed to legislate here. As Justice Harlan wrote many years ago, it's "difficult to see how words could be clearer in stating what Congress can control and what it cannot control. Surely nothing in [Article I] lends itself to the view that voting qualifications in federal elections are to be set by Congress." *Oregon v. Mitchell*, 400 U.S. 112, 210 (1970) (Harlan, J., concurring in part and dissenting in part).

The government is wrong that the States and Congress share sovereignty over voter qualifications. Due to "the Framers' aversion to concentrated power," that authority can never be wielded by the government: a "Congress empowered to regulate the qualifications of its own electorate, Madison warned, could 'by degrees subvert the Constitution.'" *Inter Tribal Council*, 570 U.S. at 17 (quoting 2 *The Records of the Federal Convention of 1787*, 250 (Farrand 1966)). Congress has no say in *who* gets to vote.

24

## IV.    Conclusion

Congress may not affirmatively establish a voter qualification. That flows from the Constitution's text and structure, from the intent of the Framers at the Convention, and from the Supreme Court's guidance in *Inter Tribal Council*. And the government cannot usurp that power by invoking immigration. The immigration power is not a general police power over aliens, and even Congress's enumerated authority buckles in the face of an affirmative constitutional restraint. Because setting a voter qualification is no part of the power the Constitution delegated to Congress, § 611 violates the residuary and inviolable sovereignty the States retain. This Court should reject the government's assertion of a police power over aliens and the authority to regulate the qualifications of its own electorate. Those powers, denied to Congress in 1787, belong to the States.

Dated at Madison, Wisconsin this 20th day of May, 2026.

Respectfully submitted,

Christian Erazo Valdez, Defendant

*/s/ Jonathan Greenberg*

Jonathan Greenberg
Alexander Vlisides
Associate Federal Defender
FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
jonathan_greenberg@fd.org